UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 17 CR 643 |
| | ) | Judge Matthew F. Kennelly |
| | ) | |
| ERIC WELLER | ) | |

# ERIC WELLER'S POSTTRIAL MOTION

Now comes the Defendant, Eric Weller, by his attorneys, Cynthia Giacchetti and Allan A. Ackerman, and pursuant to Fed.R.Crim.P. Rules 29(c)(1)-(2), 29(d)(1), Rule 33(a)(2) and Rule 34, respectfully moves that this Court grant Weller posttrial relief. In support, defendant maintains the following:

**1. Introduction: Conspiracy is not a dirty word:** Every winter holiday season since 1934, we listen endlessly to Bing Crosby's classic rendition of Felix Bernard's 1934 "Winter Wonderland," which famously includes:

> Later on, *we'll conspire*
> As we dream by the fire
> To face unafraid, the plans that we've made
> walking in a winter wonderland

And since 1925, we know from Circuit Judge Learned Hand's insightful opinion in <u>Harrison v. U.S.</u>, 7 F.2d 259, 263 (2nd Cir. 1925), [that] "conspiracy, that darling of the modern prosecutor's nursery," remains intact some 94-years later.

2. During April 2019, in advance of Weller's April 9 jury trial, the government filed a redacted indictment. In Count 1 of the redacted indictment, the government charged that Beshey, Fleming, Kourtis, Clark, Mansur, Carlucci and D. Kandalepas "conspired," with Weller, each other, and others known and unknown to commit an offense against the United States. In sum, the indictment alleged that the "conspiracy" concerned the "insider" trading of Life Time Fitness options. Weller was charged in Counts 2-4 in the redacted indictment with discrete option trading violations. Notably, Counts 2-4 "incorporated by reference, ¶s 1, 3(a)-(j), and 4(a)-(e) of Count 1 into the substantive Counts 2, 3 and 4. For inexplicable reasons, the redacted indictment is not referred to in the district court's docket in 17 CR 643.[1]

3. **Pretrial Conspiracy Filings and this Court's Memorandum Opinion Rejecting the Dismissal of the Conspiracy Count:** On August 31, 2018, Austin Mansur submitted his motion for indictment dismissal.[2] That motion challenged Count One based, *inter alia*, on: a) that Count One included contradictory and inconsistent material allegations rendering the indictment "repugnant," and therefore subject to dismissal (DOC. 161 at ¶s 6-11). Mansur's supporting memorandum of law (hereafter memo) maintained that indictment dismissal was called for because Mansur [and, of course, Weller] were "downstream tippees." *Id.* at p. 16, n. 5. According to

---

[1] The option trades alleged in Counts 2, 3 and 4 occurred on February 26 and 27, 2015. The conspiracy charged in Count 1 began "no later than February 2015," and continued until "at least in or about January 2017." Amended indictment at p. 4, ¶ 2.

[2] This Court allowed Weller's motion to join in Mansur's conspiracy dismissal filings. DOC. # 175.

Mansur's memo, the indictment failed to allege that Mansur [or Weller] knew that the insider received a benefit of any kind because the indictment alleged that LTF insider, Fleming, and Beshey, the first-level tippee, agreed that Beshey would pay Fleming in exchange for the [insider] information. DOC. 161-1 at p. 2. The same filing contends that the conspiracy count was insufficient because it failed to allege that Mansur "and similarly situated remote tippees" knew of the benefit that caused the insider to share confidential information." (n. 1 omitted). Citing Dirks v. SEC, 463 U.S. 646, 661-64 (1983), the Mansur memo, citing Dirks, *ante*, maintained that trading on material, nonpublic information is only illegal if the information was disclosed for a bad purpose. And, citing Salman v. U.S., 137 S.Ct. 420 (2016), an individual can trade while possessing material nonpublic information—unless he/she "knew both that the insider disclosed the information in breach of a duty and for a personal benefit." Salman, 137 S.Ct. at 425 n. 1.

The dismissal memo maintained that in order for criminal liability to arise, the remote tippee "must have knowledge of the insider's breach of a fiduciary duty and that the insider received a personal benefit in return for disclosing the information." *Id.* at p. 6 (n. 3 omitted). Finally, Salman includes that: "[A] tippee is exposed to liability on trading for inside information *only* if the tippee participates in a breach of the tipper's fiduciary duty." Salman, 137 S.Ct. at 427.

On 11/19/18 the government filed its opposition - response to Mansur's dismissal filings. DOC. #190. For its part, the government asserted that the indictment was sufficient because it alleged all the insider trading elements and [that] an insider

3

receives a personal benefit when he tips material, nonpublic information to benefit a friend. DOC. #190 at pp. 6-9, 10-13, citing, *inter alia*, U.S. v. Martoma, 894 F.3d 64 (2nd Cir. 2017), and SEC v. Maio, 51 F.3d 623 (7th Cir. 1995).[3]

On 12/21/18, DOC. #197, Mansur filed his response to the government's opposition memorandum. For the most part, the response incorporated repeated references to Salman, Dirks and Martoma. *Id.* at pp. 7, 9 and n. 4. Finally, after citing sister circuit cases, the response memo asserted that Blumenthal v. U.S., 332 U.S. 539, furnished no basis for departing from the established rule that there cannot be "one collective conspiracy if there is no shared goal or common purpose among alleged conspirators to carry out an unlawful activity," citing Kotteakos v. U.S., 328 U.S. 750 (1946).

On 1/22/19, DOC. #203, this Court filed its memorandum opinion order rejecting defendant's motion to dismiss Count One. In part, while rejecting indictment dismissal, this Court noted: "And defendants likewise cite no case that says that when a tipper is receiving more than one personal benefit from disclosing information, a tippee (or second-level tippee like these defendants) must be aware of each such benefit." DOC. #203 at p. 4.

Weller respectfully points out that neither he nor Mansur were second-level tippees; rather, they were third-level on the downstream or remote tippee ladder. The first tippee was Beshey, the second tippee was Peter Kourtis and Mansur/Weller were

---

[3] The government also cited Salman v. U.S., and Dirks v. SEC, while discussing personal benefits. *Id.* at pp. 8-9.

4

third-level tippees. Moreover, regarding the failure to cite supporting authority—the government was unable to supply the court with any factually parallel cases and, moving counsel vaguely recalls this Court opining that he had not located any parallel authority (third-level remote tippee and required personal-benefit original tipper knowledge).

On March 8, 2019, DOC. #218 the government filed its motion for the admission of conspiratorial hearsay, pursuant to FRE 801(d)(2)(E). Weller responded on 3/20/19, DOC. #230. In part, Weller objected to the proffered testimony concerning Peter K's statements to coindictees Mansur, Carlucci, and Kandalepas. DOC. #230 at pp. 3-5. In advance of trial, in an *Ore Tenus* ruling, this Court excluded the government's proposed conspiracy-testimony of Mr. Bonvissuto, but other wise rejected Weller's argument seeking to exclude the hearsay testimony involving Peter K., and Messrs. Carlucci, Beshey, Mansur and D. Kandalepas. ROP. 3/28/19, DOC. # 242.

4. **Relevant "Conspiracy" Testimony:** Trial notes include that prosecution witness Shane Fleming testified that he shared LTF insider information with Mr. Beshey because, after Beshey was terminated as an LTF provider, Fleming felt guilty, sorry for him and "threw him a bone — that was Fleming's motivation." Fleming also testified that he had a "soft spot" for Beshey and they did not have a financial relationship. Subsequently, Fleming decided to extract $$$ from Beshey and during March 2015, Beshey's significant other, Chastity Clark, handed Fleming an

envelope with $9500 in USC.[4]

Peter Kourtis (Peter) knew Weller from the early 2000s. During 2015 Weller was living in California, but came to Chicago every month or two; they would socialize and were very good friends. Around February 2015 Beshey contacted Peter regarding LTF. According to Peter, Beshey explained that he had a good friend who worked high up in LTF and said the company would be sold and would be going private. The stock would rise to $65 per share and it would happen in a couple of weeks. Peter spoke with Beshey and others regarding LTF stock. Peter had never purchased options and knew nothing about options. Peter then separately importuned: 1) Austin Mansur, and Weller, via telephone. Peter told Weller about what he learned from Beshey (a friend high up in LTF) and the company was going to be bought out at $65 per share. Weller told Peter that he would look into it, it was interesting and would call him back. Weller called him and said he had done research and had read about significant LTF stock purchases and that was a good sign. Peter spoke with Weller about options; but was unsure or failed to recall the entire conversation which took place during early February 2015. Concerning Peter's conversations with Carlucci, those conversations were separate and private. According to Peter, Carlucci discussed options on LTF's stock and thought that was the way to go. During the same time frame, Peter spoke with D. Kandalepas about LTF and options.

---

[4] Fleming had no contact with Weller and failed to recall meeting or speaking with Weller.

Peter purchased LTF call options on or about 3/6/15 and made money on those call options. Concerning receiving any $$$ from Weller, Peter avowed that he received no $$$ — but over the next year and a half he intermittently received what he claimed was a total of 10-15 pounds of marijuana from Weller. Peter smoked and sold the marijuana "to friends," and made about "20-30k from selling the marijuana during 2015."

When Peter initially met with the FBI he fibbed. He later told the FBI he received marijuana from Weller based on their agreement concerning the LTF information. The government never asked for the names of Peter's other marijuana suppliers. Importantly, each conversation he had was "separate," meaning when he was selling the LTF information to Carlucci, Mansur, Kandalepas and Weller.[5]

Relatedly, Carlucci testified that he bought and sold marijuana. One of his marijuana suppliers was Peter. Those marijuana sales between Peter and Carlucci were separate in the sense that Peter didn't care what Carlucci did with the marijuana as long as Carlucci paid him. Carlucci had the same relationship with Nick Favia (an immunized nonwitness), meaning that Nick was a marijuana seller and Carlucci was a buyer. Neither cared what Carlucci did with the marijuana after he bought it. Carlucci agreed that regarding marijuana, he and Peter had a buyer/seller relationship. Carlucci recalled that when Peter furnished him with the LTF information, he

---

[5] In contrast to others, D. Kandalepas testified that Peter didn't ask him for a kickback for the LTF tip. He also testified that he met up with Peter during September 2016 after Peter was interviewed by the FBI. D. Kandalepas testified that he told Peter he was interviewed by the FBI and he told the FBI the truth. Peter was unhappy about that turn of events.

7

"believed" Peter told him not to tell anyone. Carlucci conceded that just like his marijuana dealings with Peter, the LTF circumstances were no different than Peter selling him marijuana and he was buying it. Further, Carlucci acknowledged that his LTF dealings with Peter were on a buyer/seller basis, but he didn't have to give anything back to Peter unless he traded the LTF stock.

5. Weller maintains that taking the evidence in a light most flattering to the government, it recounts a series of individual "Buyer-Seller" LTF - deals. Peter was selling LTF information/tips and Carlucci, Mansur, D. Kandalepas and Weller were "buyers."

Weller maintains that the LTF dealings between Peter K and others failed to rise to the level of conspiratorial misconduct. Thus, Weller maintains that this Court should strike the testimony it permitted based on FRE 801(d)(2)(e), and enter an order granting this posttrial motion. Failing a plenary order granting Weller's motion for judgment of acquittal, [a] mistrial should be ordered in order to ameliorate the prejudice Weller suffered by virtue of the wholesale admission of the government's purported conspiratorial hearsay testimony and evidence.

6. In U.S. v. Townsend, 924 F.2d 1385, 1390 (7th Cir. 1991), the court explained: "To join a conspiracy is to join an agreement, rather than a group. It follows that to be a conspirator you must know of the agreement, and must intend to join it." (Internal supporting citations omitted).

7. Weller maintains that this Court prejudicially erred by refusing to instruct the jury concerning his buyer-seller theory of defense. The U.S. Court of Appeals for the Seventh Circuit has consistently explained the distinction between a buyer-seller relationship and a conspiracy. Moreover, the denial of a buyer-seller jury instruction is the subject of *de novo* review. U.S. v. Love, 706 F.3d 832, 838 (7th Cir. 2013).

Indeed, defendant was entitled to his theory-of-defense jury instruction and, if this Court determines that Peter K. was *selling* LTF insider information and Weller, along with Messrs. Mansur, Carlucci, Kandalepas and others were "buyers," then, as a matter of law, there was no conspiracy as alleged in Count One. *Cf.* U.S. v. Falcone et al, 311 U.S. 205, 210, 61 S.Ct. 204, 207 (1940) (The gist of the offense of conspiracy as defined by s 37 of the Criminal Code, 18 U.S.C. s 88, 18 U.S.C.A. s 88, is agreement among the conspirators to commit an offense attended by an act of one or more of the conspirators to effect the object of the conspiracy. * * * Those having no knowledge of the conspiracy are not conspirators, * * * and one who without more furnishes supplies to an illicit distiller is not guilty of conspiracy even though his sale may have furthered the object of a conspiracy to which the distiller was a party but of which the supplier had no knowledge. On this record we have no occasion to decide any other question.) (Internal citations omitted); accord, U.S. v. Cruse 805 F.3d 795, 813-816 (7th Cir. 2015) (reversing defendant Cruse's drug convictions because the trial court refused defendant's buyer-seller [theory of defense] jury

9

instruction) (coll. cases).⁶

8. Weller advances that the Court prejudicially erred while admitting testimony concerning putative conspiracy-conversations—occurring more than 18-months after the February/March 2015 LTF events. Bereft of specific February/March 2015 conversations leading up to the buying and selling of LTF options, Weller maintains that the post-conspiracy-completion-conversations were not "in furtherance of the conspiracy."⁷

Simply stated, Weller posits that by March 2015, the events comprising the central objectives of the LTF conspiracy had been attained. (E.g., the buying and selling of the LTF options and the Beshey/Peter kickbacks were completed.) Hence, the 2016/2017 conversations were not "in furtherance" of the conspiracy but, rather, demonstrated "nothing more than that the conspirators did not wish to be

---

⁶ The Cruse Court cited U.S.C.A. 7 pattern instruction 5.10(A), which reads: A conspiracy requires more than just a buyer-seller relationship between the defendant and another person. In addition, a buyer and seller of [cocaine] do not enter into a conspiracy to distribute [cocaine] simply because the buyer resells [cocaine] to others, even if the seller knows that the buyer intends to resell the [cocaine].

⁷ Peter testified, *inter alia*, that at some point during the Fall of 2016 he twice spoke with Weller and Carlucci. Those conversations included Weller calming down Peter who had been approached by the FBI during the Fall of 2016. Carlucci testified that he met with Peter, Weller, and possibly with Nick Favia and Austin M during the Fall of 2016 and January or February 2017. Those conversations involved plans to stick together and deny any kickbacks to Peter. The last Carlucci-Weller conversation was during January or February 2017 at Carlucci's abode. That meeting was apparently arranged by Nick Favia. The record is murky concerning exactly when Peter, Nick Favia, Carlucci and D. Kandalepas furnished information to the government in exchange for government considerations.

apprehended," and are not actions done in furtherance of the conspiracy. *Cf*. Grunewald v. U.S., 335 U.S. 391, 406, 77 S.Ct. 963 (1957). As the 4th circuit explained in U.S. v. Wilson, 624 F.3d 640 (4th Cir. 2010):

> In *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), the Supreme Court noted, "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up the crime." Id. at 405, 77 S.Ct. 963. The latter demonstrates "nothing more than that the conspirators do not wish to be apprehended," and are not actions done in furtherance of the conspiracy. Id. at 406, 77 S.Ct. 963.

Wilson, 624 F.3d at 656 n. 18 (quotation marks in original text).[8]

Weller asserts that this Court prejudicially erred while admitting the 2016/2017 post-conspiracy testimony. The record recounts that the challenged conversations occurred at least 18-months after the central objective of the LTF insider trading conspiracy concluded. Thus, those conversations should not have been admitted as "in furtherance of the charged conspiracy."

---

[8] In U.S. v. Gajo, 290 F.3d 922, 928 (7th Cir. 2002), the court, rejected a similar "concealment" conspiracy arguments in an arson-insurance proceeds prosecution because, *inter alia*, the central objective of that [Gajo] arson conspiracy continued until arson defendants obtain insurance proceeds or abandon "their quest." The Gajo Court cited additional 7th circuit authorities explaining that in those arson/insurance conspiracy prosecutions, the conspiracy continues "until defendants obtain the insurance money or abandon their quest." In other words, the central or primary objectives in arson-for-profit schemes extend well-beyond the actual arson occurrence. Given the arson-for-profit scheme, the Gajo Court rejected Grunewald and its progeny. 290 F.3d at 928.

9. **Defendant's Objections to ¶ 4 of the Trial Court's Jury Instructions: Counts 2, 3 and 4 - definition of device, scheme, or artifice to defraud, ¶ 4** (p. 19 of the Court's 4/12/19 jury instructions) include the following: Mr. Weller maintains that ¶ 4 permits the jury to convict him based on the relationship/kickback deal between Messrs. Fleming and Beshey. Weller maintains that because he is an attenuated - remote - third-level - tippee, he lacks the wherewithal to challenge the Fleming-Beshey relationship/deal. Mr. Beshey did not testify and Mr. Fleming acknowledged never meeting or speaking with Weller. Weller contends that the benefit(s) language in ¶ 4 is the functional equivalent of directing a verdict in favor of the government on the insider - trading - personal benefit(s) issue. *Cf.* U.S. v. Hogue, 132 F.3d 1087, 1089 (5th Cir. 1998) (a judge may not direct a verdict of guilty no matter how conclusive the evidence) (coll. cases); U.S. v. Sabetta, 373 F.3d 75, 80 (1st Cir. 2004) (same).

10. **WHEREFORE**, defendant, Eric Weller, respectfully moves that this Court enter an order or orders granting the foregoing consolidated posttrial motion, or such other or further relief as this Court deems appropriate. Additionally, pursuant to Rule 30(d), Weller maintains that his proposed buyer-seller instruction representing his theory-of-the-case should not have been rejected. Further, defendant's Rule 30(d) objections to ¶ 4 of the Court's insider trading instructions were subject to Weller's objections which this Court agreed were not "waived." Again, Weller maintains that because the government forcefully argued the Fleming/Beshey relationship/deal and based on this Court's instructions, that

relationship comprised the *sine qua non* of the "benefits," Weller was inordinately prejudiced because he had no way of challenging the Fleming/Beshey interactions.

                                                                                       Respectfully submitted,

| | |
|---|---|
| Allan A. Ackerman, Esq.<br>Attorney at Law<br>19 S. LaSalle Street<br>Suite 502<br>Chicago, Illinois  60603<br>Telephone: (312) 332-2891<br>Facsimile: (312) 750-1595<br>email: profaaa@aol.com<br><br>Cynthia Giacchetti<br>Attorney at Law<br>53 W. Jackson Blvd.<br>Suite 1035<br>Chicago, IL 60604<br>Telephone: (312) 939-6440<br>Facsimile: (312) 362-9907<br>email: cg@cgdefense.com | /s/Allan A. Ackerman<br>Allan A. Ackerman<br>One of the Attorneys for<br>Defendant, Eric Weller |