UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 17 CR 643-6 |
| v. ) | |
| ) | Honorable Matthew F. Kennelly |
| ERIC WELLER ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA, by JOHN R. LAUSCH, JR., United States Attorney for Norther District of Illinois, submits this sentencing memorandum concerning defendant Eric Weller. For the reasons set forth below, the government respectfully requests that this Court sentence defendant to a sentence of imprisonment within the advisory Sentencing Guidelines range of 51 to 60 months' imprisonment.

**I.    Offense Conduct**

Beginning in February 2015, defendant Eric Weller and eight co-defendants participated in a conspiracy to engage in insider trading in the publicly traded stock options of Life Time Fitness, Inc. For illustrative purposes, the following diagram summarizes the flow of the material, nonpublic information among the nine

defendants:



Specifically, on or about February 23, 2015, co-defendant Shane Fleming, while working as the Vice President of Corporate Sales at Life Time Fitness, Inc., learned material, nonpublic information about Life Time Fitness, Inc., namely, that Life Time Fitness, Inc. would be acquired by another company within the next 30 days, and the sale would cause Life Time Fitness, Inc.'s share price to increase to at least $65 per share. GV Ex. A (Shane Fleming Grand Jury statement) at 2. Fleming knew he owed Life Time Fitness duties of confidentiality and loyalty that prohibited him from disclosing the information he had learned about the upcoming acquisition of Life Time Fitness by a private company. *Id*. However, on or about February 23, 2015, Fleming breached the duties he owed to Life Time Fitness, and did so in exchange for a personal benefit, when he shared the material, nonpublic information with his long-time friend, co-defendant Bret Beshey, knowing Beshey would use the information to trade. *Id.* at 3. Fleming shared the information with Beshey based on their long-time friendship and not because he wanted to share any of the profits Beshey made

when he used the information to trade and profit. *Id.* at 3-4; GV Ex. B at 2. However, although Fleming's initial motivation was to share the information with Beshey based on friendship, after he did so, Beshey said that he (Beshey) would share the material, nonpublic information with others and have them trade, and Beshey offered to "take care of" Fleming, i.e., share some of the profits with Fleming. *Id.*

After learning the material, nonpublic information from Fleming, in late February 2015 Beshey shared the information with, among others, his long-time friend and business partner, co-defendant Peter Kourtis. *Id.* at 4; GV Ex. C (Peter Kourtis Grand Jury statement) at 2. Based on the information from Beshey, Kourtis knew: (i) that the source of the information was Beshey's long-time and close personal friend, "Shane"; (ii) that "Shane" was a senior employee at Life Time Fitness, Inc.; and (iii) that "Shane" had misappropriated the material, nonpublic information from Life Time Fitness, Inc. in breach of a duty of trust and confidence to keep such information confidential by sharing the information with Beshey so that Beshey could trade and profit. *Id.* Beshey and Kourtis agreed that Kourtis would purchase out-of-the-money Life Time Fitness call options while in possession of the material, nonpublic information and they would share some of the profits from Kourtis' trading. Beshey and Kourtis also agreed that Kourtis would share the information with Kourtis' trusted friends. *Id.* Beshey and Kourtis agreed that if Kourtis' trusted friends used the information to trade, Beshey and Kourtis would share some of those trading profits as well. *Id.*

On or about February 24, 2015, Kourtis shared the material, nonpublic

information with Weller, and around that same date Kourtis shared the same information with co-defendants Mansur, Carlucci and Kandalepas. *Id.* at 5. Kourtis and Weller had met in the 1990s when they were both incarcerated in the Illinois Department of Corrections, and they had remained friends since that time. *Id.* Kourtis told Weller that Life Time Fitness would be acquired by another company in the next 30 days, and the sale would cause Life Time Fitness' share price to increase to approximately $65 per share. *Id.* Kourtis explained to Weller that the material, nonpublic information about the imminent acquisition of Life Time Fitness came from Kourtis' friend, co-defendant Bret Beshey, who had learned the information from a senior executive at Life Time Fitness. *Id.* Based on his discussions with Kourtis, including the specificity of the material, nonpublic information, Weller understood that the Life Time Fitness insider who shared the information with Beshey had not done so for a legitimate corporate purpose, but had instead shared the information so that his friend could use the material, nonpublic information to trade and profit. *See Id.*

Between on or about February 25, 2015 and March 5, 2015, Weller, while in possession of the material, nonpublic information, used approximately $54,349 in a securities brokerage account held in his name at Interactive Brokers to purchase approximately 1,010 out-of-the-money Life Time Fitness stock options. Trial Exs. 12 and 16. The call options had expiration dates of March 20, 2015 and April 17, 2015 and strike prices of $60 and $65 per share. Trial Ex. 16. Between February 25, 2015 and March 5, 2015, Kourtis, Mansur, Carlucci and Kandalepas each used the

material, nonpublic information to buy similar Life Time Fitness stock options. *Id.*

When the New York Stock Exchange closed on March 5, 2015, Life Time Fitness' share price was $57.67. Trial Ex. 11. After the close of trading on March 5, 2015, the Wall Street Journal published an article reporting that Life Time Fitness was in advanced discussions to sell all of the company's outstanding shares to one of two private equity firms. *Id.* On March 6, 2015, Life Time Fitness, Inc.'s share price increased to a high of $69.13. *Id.*

Beginning on or about March 6, 2015, when the news became public that two private equity firms were purchasing all of Life Time Fitness' shares, the Life Time Fitness share price increased and Weller began selling the Life Time Fitness securities he had purchased. Trial Exs. 12 and 16. Weller's total profits from the Life Time Fitness stock options that he purchased prior to March 6, 2015 totaled approximately $554,777.[1] *Id.*

Beginning on March 6, 2015, co-defendants Kourtis, Mansur, Carlucci and Kandalepas also sold the Life Time Fitness stock options they had purchased using the material, nonpublic information. Trial Ex. 16.

After receiving the $554,777 in insider trading profits, Weller paid a kickback to Kourtis as a "thank you" for the material, nonpublic information Kourtis had

---

[1] After the news became public on March 5, 2015, Weller purchased additional Life Time Fitness stock options and sold those stock options for a loss of approximately $18,000. Because those purchases were made after the material information was no longer nonpublic, the government's position is that Weller's post-March 5, 2015 trades were not illegal insider trading.

5

shared with Weller on or about February 24, 2015. GV Ex. C at 8. Weller did not pay the kickback by wire, check or cash, and instead paid Kourtis 10-15 pounds of marijuana, in approximately two-pound increments, during a period of a year and a half. *Id.* Kourtis sold the marijuana he received from Weller for at least $20,000. *Id.*

Co-defendants Mansur and Carlucci also paid kickbacks to Kourtis after receiving their insider profits. *Id.* Kourtis shared some of his trading profits with Beshey and Clark (*Id.* at 7), who in turn shared some of the profits with Fleming. GV Ex. A at 5.

In or about September 2016, Weller and other co-defendants learned that the FBI and SEC were investigating whether Weller and his eight co-defendants had engaged in a conspiracy to commit insider trading in Life Time Fitness securities, and they took steps to conceal the insider trading from law enforcement. GV Ex. D (March 29, 2019 Interview with Alex Carlucci) at 2. For example, in or about October 2016, Weller traveled from California to Illinois to meet with co-defendants Kourtis and Alex Carlucci at Carlucci's house so they could agree on a story to tell law enforcement who were investigating their insider trading. *Id.* During that meeting, Weller, Kourtis and Carlucci agreed that they would not cooperate with law enforcement, and they discussed how it would it be difficult for law enforcement to prove that they knew the information came from an insider at Life Time Fitness. *Id.* Weller, Kourtis and Carlucci also agreed that they would lie to law enforcement if they were asked about the kickback payments to Kourtis. *Id.* During the meeting, Weller also told Kourtis and Carlucci that if asked by law enforcement why he had

6

traded, he would tell law enforcement that he had done his own due diligence to confirm the material, nonpublic information he had learned from Kourtis. *Id.*

In or about February 2017, Weller again traveled from California to Illinois for a meeting at co-defendant Carlucci's house. *Id.* During that meeting, Weller told Carlucci that he was worried Kourtis was cooperating with the government's investigation of their insider trading in Life Time Fitness securities. *Id.* Weller told Carlucci not to talk with law enforcement about the insider trading and to instead hire an attorney. Weller also told Carlucci, "Don't talk. Don't testify. I can crush Peter [Kourtis] in court." *Id.*

At all relevant times, Life Time Fitness, Inc. stock options were traded on the Chicago Board Options Exchange ("CBOE"), a national securities exchange with its headquarters and operations in Chicago, Illinois, and CBOE cleared stock options trades through the Options Clearing Corporation, which was headquartered in Chicago, Illinois.

## II. The Advisory Sentencing Guidelines Range

The government agrees with Probation's advisory Sentencing Guidelines range calculation of 51 to 60 months' imprisonment. PSR ¶ 91. The base offense level is 8, pursuant to Guideline § 2B1.4(a), and pursuant to Guidelines §§ 2B1.4(b)(1) and 2B1.1(b)(1)(H), defendant's offense level is increased by 14 levels, because the combined gain to defendant and the co-conspirators who acted in concert with him was more than $550,000 but less than $1,500,000.

7

The government agrees with the PSR's calculation of a two-level enhancement under Guideline §3C1.1, because the defendant willfully attempted to obstruct the administration of justice with respect to the investigation or prosecution of the instant offense of conviction. PSR ¶ 32.

The government also agrees that defendant's Guidelines are calculated based on a criminal history that includes zero criminal history point, and defendant's criminal history category is I. PSR ¶ 46.

Therefore, as correctly calculated by the Probation Office, the defendant's offense level is 24, which, when combined with the anticipated criminal history category of I, results in an anticipated advisory sentencing guidelines range of 51 to 60 months' imprisonment, in addition to any supervised release and fine the Court may impose.

### III.  Application of the § 3553(a) Factors

As part of the sentencing process, the Court is to consider the factors set forth in 18 U.S.C. § 3553(a), and impose a sentence that is sufficient, but not more than necessary, to achieve the goals of sentencing. The relevant § 3553(a) factors in this case include: (1) the nature and circumstances of the offense; (2) defendant's history and characteristics; (3) the need to reflect the seriousness of the offense, to promote respect for the law, to afford adequate deterrence, and to provide just punishment for the offense; and (4) the need for restitution. The government submits that these factors weigh in favor of a Guideline range sentence.

## A. The Nature and Circumstances of Defendant's Offense Weigh in Favor of a Guidelines Sentence

The nature and circumstances of defendant's offense weigh in favor of a sentence within the advisory Guidelines range. Insider trading is a serious crime that undermines confidence in the integrity of the financial markets, disadvantages ordinary investors who follow the rules, and violates the confidence of companies whose information is misappropriated. Because it is a serious crime with damaging effects, insider trading calls for a substantial sentence. *See United States v. O'Hagan*, 521 U.S. 642, 659 (1997) (noting the "inhibiting impact on market participation of trading on misappropriated information"); *United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (stating an insider trading defendant's "corrosive influence on the integrity of the financial markets and on the expectation of trust and confidence … required a significant punishment" and affirming a 120-month sentence).

The defendant's participation in the insider trading conspiracy in this case was not a momentary lapse in judgment that resulted in a single trade. Rather, between February 25, 2015 and continuing through March 5, 2015, defendant purchased 1,010 Life Time Fitness stock options using material, nonpublic information that he knew had been stolen by an insider at Life Time Fitness and tipped to a friend for no legitimate corporate purpose, so the insider's friend could trade and profit. Each time defendant traded, he made a conscious, deliberate choice to violate the law. As a result, the considerations of 18 U.S.C. § 3553(a)(2)(A) warrant a Guideline sentence.

9

Defendant's sophistication as an investor is also an aggravating factor that distinguishes him from his co-defendants and weighs in favor of a Guideline sentence. During his interview with the Probation Officer, defendant explained that he has been a self-employed trader since 2012 and has earned approximately $200,000 to $300,000 annually through securities trading. PSR ¶¶ 77-78. In account opening documents that defendant submitted to a securities brokerage firm in 2013, defendant described himself as a trader with "6-10" years of experience who had "extensive" experience trading options. Trial Ex. 19. In fact, defendant did not just make a living trading securities in his own brokerage account. He also had discretionary authority and traded securities using other people's funds. Trial Ex. 108 (Gain Capital Records). As a result, defendant's level of sophistication as an investor and trader distinguishes him from his co-defendants and weighs in favor of a Guidelines sentence.

In addition, while other co-defendants used the information to dabble in insider trading, when defendant received the material, nonpublic information from co-defendant Kourtis, defendant knew exactly how to monetize it and immediately made substantial, lucrative investments. Below is a chart summarizing the approximate insider trading profits for defendant and the five co-defendants who traded in late February and early March 2015 using the material, nonpublic information about Life Time Fitness:

| Trader | First Purchase | Sales Started | # of Contracts | Call Expiration | Strike Price | Total Purchase Price | Total Sales Proceeds | Profit |
|---|---|---|---|---|---|---|---|---|
| Weller | 2/25/2015 | 3/6/2015 | 1,010 | 3/20 | 60, 65, 70 | $54,349.38 | $609,127.19 | $554,777.81 |
| Mansur | 2/26/2015 | 3/6/2015 | 465 | 3/20 & 4/17 | 60, 65, 70 | $30,841.44 | $164,167.45 | $133,326.01 |
| Kourtis | 2/25/2015 | 3/6/2015 | 300 | 3/20 | 65 | $10,427.70 | $103,171.44 | $92,743.74 |
| Kandalepas | 3/3/2015 | 3/6/2015 | 140 | 3/20 | 65 | $2,918.35 | $40,530.91 | $37,612.56 |
| Bonvissuto | 2/25/2015 | 3/6/2015 | 144 | 3/20 | 65 | $5,296.00 | $38,973.11 | $33,677.11 |
| Carlucci | 3/2/2015 | 3/6/2015 | 40 | 3/20 | 60, 65 | $2,023.63 | $16,515.27 | $14,491.64 |
| | | | | | | | | **Total Profit: $866,628.87** |

The amount of defendant's insider trading profits also weighs in favor of a Guideline sentence. Indeed, the amount of money a defendant profits through fraud speaks in a meaningful way to the wrongfulness of the conduct. A defendant who, like defendant, receives fraud profits totaling $554,777—substantially more than the insider trading profits received by all eight of his co-defendants combined—has simply committed a greater transgression than someone who perpetrates a crime that reaps profits totaling a fraction of that amount, just as a thief who steals diamonds bears more culpability than a shoplifter who steals a candy bar. Further, the $554,777 in insider trading profits that the defendant received did not appear out of thin air. The defendant's $554,777 in illegal trading profits came from victims who were on the other side of the Life Time Fitness options contracts—victims who, unlike defendant, did not have access to material, nonpublic information that had been stolen by a Life Time Fitness insider.

The nature and characteristics of defendant's offense also included substantial efforts to cover up his role in the insider trading conspiracy and to obstruct the government's investigation and prosecution of his criminal conduct. For example, in

or about October 2016, Weller traveled from California to Illinois to meet with co-defendants Kourtis and Alex Carlucci at Carlucci's house so they could agree on a story to tell law enforcement who were investigating their insider trading. GV Ex. D (March 29, 2019 Interview with Alex Carlucci) at 2. Defendant told Carlucci not to talk with law enforcement about the insider trading and to instead hire an attorney. Defendant also told co-defendant Carlucci, "Don't talk. Don't testify. I can crush Peter [Kourtis] in court." *Id*. The government agrees with the Probation Office's conclusion that the defendant "willfully attempted to obstruct the administration of justice with respect to the investigation or prosecution of the instant offense." PSR ¶¶ 21-22; 33. This is another aggravating factor for the Court to consider, and it, too, weighs in favor of a Guidelines sentence.

   **B. Defendant's History and Characteristics Further Weigh in Favor of a Sentence in the Advisory Guidelines Range**

The PSR sets forth in detail defendant's history and characteristics, including aspects of defendant's employment, his childhood, and his relationship with family and friends. But nothing in the PSR begins to explain why defendant chose to engage in illegal trading.

Defendant's history and characteristics include a 1987 conviction for Armed Violence that resulted in a seven-year prison sentence. PSR at ¶ 42. While this conviction does not result in any criminal history points under the Guidelines, it is important because that lengthy prison sentence did not deter defendant from engaging in additional serious crimes—namely, his participation in the criminal

insider trading conspiracy for which he now faces sentencing.

Further, defendant committed this offense despite having substantial assets. Defendant explained to the Probation Department that between 2012 and 2016, he earned between $200,000 and $300,000 annually from securities trading. PSR at ¶ 77. Defendant also appears to have had numerous assets, including several luxury cars and a home that he has since sold for $600,000. PSR at ¶¶ 77 and 81. All of this points to the inescapable conclusion that there was absolutely no reason, financial or otherwise, for defendant to engage in insider trading, other than greed and an arrogant belief that he would not be caught. That is an aggravating factor the Court should consider. *See, e.g., United States v. Anderson*, 517 F.3d 953, 966 (7th Cir. 2008) (noting that district court considered that "[w]hile many criminals commit crimes from lack of opportunity and desperation, [defendant] acted out of greed.").

### C. A Sentence in the Advisory Guidelines Range Will Provide Adequate Deterrence to Others

The need to afford adequate deterrence to others is a critical part of the sentence to be imposed in this case for a number of reasons. First and foremost, defendant is the exact type of defendant and committed the exact type of crime where general deterrence matters. Insider trading is a crime most often committed by affluent and well-educated defendants. In this case, as in most insider trading cases, it was not a crime of need or passion. Crimes of this nature can be deterred with punishment that includes meaningful terms of incarceration. Other would-be defendants who are thinking about profiting by using material, non-public

13

information will think twice if they believe their actions will have serious consequences. These consequences cannot be simply financial inconveniences such as disgorgement of ill-gotten gains or the payment of fines. Instead, the consequences need to include depriving wrongdoers of their liberty to be effective in deterring others.

Similarly, insider trading cases can be difficult to detect and prove, and lucrative to the participants. Thus, it is important that sentences in this and other fraud cases serve to deter individuals from committing the same crime. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) (Posner, J.) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012) ("[I]nsider trading is an easy crime to commit but a difficult crime to detect. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail."). Here, while it is unlikely that defendant will engage in insider trading again in the future, general deterrence—together with the other 3553 factors—requires a Guidelines sentence.

## IV. The Court Should Impose Conditions of Supervised Release

The government agrees with Probation's recommended term and conditions of supervised release.

14

## V. Restitution and Forfeiture

As was the case with defendant's eight co-defendants, the government is not seeking a restitution judgment against the defendant. This is because identifying the victims on the other side of the options trades—victims who did not have access to the material, nonpublic information that defendant had and used to profit more than $550,000—would complicate and prolong the sentencing process.

In addition to his failure to accept responsibility for his criminal conduct, defendant has not, unlike his co-defendants, resolved his civil case with the SEC or otherwise agreed to disgorgement of his illegal insider trading profits. The government has filed a motion for a preliminary order of forfeiture of defendant's trading profits, totaling $554,777. At sentencing, the government anticipates seeking a preliminary order of forfeiture in that amount.

## VI. Conclusion

For the reasons set forth above, the government respectfully requests that this Court impose a sentence within the advisory Sentencing Guidelines.

> Respectfully submitted,
>
> JOHN R. LAUSCH, JR.
> United States Attorney
>
> By: */s/ John D. Mitchell*
> JOHN D. MITCHELL
> JASON A. YONAN
> Assistant United States Attorneys
> 219 S. Dearborn Street, 5th Floor
> Chicago, Illinois 60604
> (312) 353-5159